# UNITED STATES *v.* SECURITY INDUSTRIAL BANK ET AL.

No. 81–184.   Argued October 6, 1982—Decided November 30, 1982

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 82.

*Alan I. Horowitz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath,* and *Deputy Solicitor General Geller.*

*Henry F. Field* argued the cause for appellees. With him on the briefs for appellee Beneficial Finance of Kansas, Inc., were *Abe Fortas, Phil C. Neal,* and *Joseph M. Berl. Michael E. Katch* filed a brief for appellees Security Industrial Bank et al.

JUSTICE REHNQUIST delivered the opinion of the Court.

This case concerns the effect of 11 U. S. C. § 522(f)(2) (1976 ed., Supp. V), which permits individual debtors in bankruptcy proceedings to avoid liens on certain property. The Court of Appeals consolidated seven appeals from the Bankruptcy Courts for the Districts of Kansas and Colorado. In each case the debtor was an individual who instituted bankruptcy proceedings after the Bankruptcy Reform Act of 1978, Pub. L. 95–598, 92 Stat. 2549 (1978 Act), became effective on October 1, 1979. In each case one of the appellees had loaned the debtor money and obtained and perfected a lien on the debtor's household furnishings and appliances before the 1978 Act was enacted on November 6, 1978. None of these liens was possessory, and none secured purchase-money obligations.

Included within the personal property subject to the appellees' liens were household items that are exempt from the property included within the debtors' estates by virtue of

subsections (b) and (d) of § 522.[1] The debtors claimed these exemptions in their respective bankruptcy proceedings, relying on § 522(f)(2) to avoid the liens. That section provides:

"Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

.        .        .        .        .

"(2) a nonpossessory, nonpurchase-money security interest in any—

"(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical in-

---

[1] The exemptions were designed to permit individual debtors to retain exempt property so that they will be able to enjoy a "fresh start" after bankruptcy.

Subsections (b) and (d) of § 522 provide in pertinent part:

"(b) [A]n individual debtor may exempt from property of the estate . . . —

"(1) property that is specified under subsection (d) of this section . . .

.        .        .        .        .

"(d) The following property may be exempted under subsection (b)(1) of this section:

.        .        .        .        .

"(3) The debtor's interest, not to exceed $200 in value in any particular item, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held primarily for the personal, family or household use of the debtor or a dependent of the debtor.

"(4) The debtor's aggregate interest, not to exceed $500 in value, in jewelry held primarily for the personal, family, or household use of the debtor or the dependent of the debtor.

.        .        .        .        .

"(6) The debtor's aggregate interest, not to exceed $750 in value, in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor.

.        .        .        .        .

"(9) Professionally prescribed health aids for the debtor or a dependent of the debtor."

struments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;

"(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

"(C) professionally prescribed health aids for the debtor or a dependent of the debtor."

The appellees asserted that application of § 522(f)(2) to liens acquired before the enactment date would violate the Fifth Amendment. The United States intervened in each case to defend the constitutionality of the federal statute,[2] but the Bankruptcy Courts in each case refused to apply § 522(f)(2) to abrogate liens acquired before the enactment date.[3]

The Court of Appeals consolidated the cases and affirmed the judgments of the Bankruptcy Courts. 642 F. 2d 1193 (CA10 1981). It held that the 1978 Act was intended to apply retrospectively, and thus was designed to invalidate liens acquired before the enactment date. It also held, however, that such an application violates the Fifth Amendment. The court stated that § 522(f)(2) effects a "complete taking of the secured creditors' property interests," and is thus invalid under *Louisville Joint Stock Land Bank* v. *Radford,* 295

---

[2] See 28 U. S. C. § 2403(a).

[3] In *Schulte* v. *Beneficial Finance of Kansas, Inc.,* and *Hunter* v. *Beneficial Finance of Kansas, Inc.,* 8 B. R. 12 (1980), the Bankruptcy Court for the District of Kansas noted that retrospective application of § 522(f)(2) creates constitutional problems and held that it should be applied only prospectively. In *Jackson* v. *Security Industrial Bank,* and *Stevens* v. *Liberty Loan Corp.,* 4 B. R. 293 (1980), *Rodrock* v. *Security Industrial Bank,* and *Knezel* v. *Security Industrial Bank,* 3 B. R. 629 (1980), the Bankruptcy Court for the District of Colorado concluded that § 522(f)(2), as applied retrospectively, violates the Due Process Clause of the Fifth Amendment. In *Hoops* v. *Freedom Finance,* 3 B. R. 635 (1980), the Bankruptcy Court for the District of Colorado concluded that § 522(f)(2), as applied retrospectively, violates "substantive due process."

U. S. 555 (1935).[4]   The United States appealed, and we noted probable jurisdiction.   454 U. S. 1122 (1981).

The appellees, of course, defend the judgment of the Court of Appeals.[5]   The Government argues at some length that retrospective application of § 522(f)(2) to these liens would not violate the Fifth Amendment.   It contends that the enactment is a "rational" exercise of Congress' bankruptcy power, that for "bankruptcy purposes" property interests are all but indistinguishable from contractual interests, and that these particular interests were "insubstantial" and therefore their destruction does not amount to a "taking" of property requiring compensation.   We do not decide the constitutional question reached by the Court of Appeals.   We address it only to determine whether the attack on the retrospective application of the statute raises substantial enough constitutional doubts to warrant the employment of the canon of statutory construction referred to *infra*, at 78–81.

It may be readily agreed that § 522(f)(2) is a rational exercise of Congress' authority under Art. I, § 8, cl. 4, and that this authority has been regularly construed to authorize the retrospective impairment of contractual obligations.   *Hano-*

---

[4] *In re Gifford*, 688 F. 2d 447 (CA7 1982) (en banc), holds that § 522(f)(2) constitutionally applies to liens created before the enactment date.   *In re Webber*, 674 F. 2d 796 (CA9 1982), holds that § 522(f)(2) constitutionally applies to liens created before the Act became effective but after the enactment date.   *In re Ashe*, 669 F. 2d 105 (CA3 1982), holds that § 522(f)(1), which permits avoidance of certain judicial liens, constitutionally applies to a cognovit note created before the enactment date.

[5] Appellee Beneficial Finance of Kansas, Inc., asserts that the judgments should be affirmed because the Act violates Art. III of the Constitution by granting judicial power to non-Art. III bankruptcy judges.   See *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982) (plurality opinion of BRENNAN, J.); *id.*, at 90–91 (REHNQUIST, J., concurring in judgment).   Because our decision in *Northern Pipeline* is prospective only, *id.*, at 87–89, and because we have stayed the issuance of our mandate in that case to December 24, 1982, *post*, p. 813, that decision does not affect the judgment in this case.

*ver National Bank* v. *Moyses,* 186 U. S. 181, 188 (1902). Such agreement does not, however, obviate the additional difficulty that arises when that power is sought to be used to defeat traditional property interests. The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation. *Louisville Joint Stock Land Bank* v. *Radford, supra.* Thus, however "rational" the exercise of the bankruptcy power may be, that inquiry is quite separate from the question whether the enactment takes property within the prohibition of the Fifth Amendment.

The Government apparently contends (Brief for United States 30–32) that because cases such as *Arnett* v. *Kennedy,* 416 U. S. 134 (1974), and *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), defined "property" for purposes of the Due Process Clause sufficiently broadly to include rights which at common law would have been deemed contractual, traditional property rights are entitled to no greater protection under the Takings Clause than traditional contract rights. It argues that "bankruptcy principles do not support a sharp distinction between the rights of secured and unsecured creditors." Brief for United States 31. However "bankruptcy principles" may speak to this question, our cases recognize, as did the common law, that the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral. Compare *Hanover National Bank* v. *Moyses, supra,* with *Louisville Joint Stock Land Bank* v. *Radford, supra,* and *Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979).

Since the governmental action here would result in a complete destruction of the property right of the secured party, the case fits but awkwardly into the analytic framework employed in *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104 (1978), and *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980), where governmental action

affected some but not all of the "bundle of rights" which constitute the "property" in question. The Government argues that the interest of a secured party such as was involved here is "insubstantial," apparently in part because it is a nonpurchase-money, nonpossessory interest in personal property. The "bundle of rights" which accrues to a secured party is obviously smaller than that which accrues to an owner in fee simple, but the Government cites no cases supporting the proposition that differences such as these relegate the secured party's interest to something less than property.[6] And our decisions in *Radford, supra,* and *Armstrong v. United States,* 364 U. S. 40 (1960), militate against such a proposition.

In *Radford,* we held that the Frazier-Lemke Act, 48 Stat. 1289, violated the Takings Clause. The bank held a nonpurchase-money mortgage on Radford's farm. Radford defaulted and instituted bankruptcy proceedings. The Frazier-Lemke Act, which by its terms applied only retrospectively, permitted the debtor to purchase the property for less than its fair market value.[7] We held the statute was

---

[6] At oral argument the Government conceded that the liens at issue in this case are treated as property under state law. Tr. of Oral Arg. 21.

Both Kansas and Colorado have adopted the Uniform Commercial Code. Although under the Code the priority among secured parties is often affected by the purchase-money or possessory character of security interests, see, *e. g.,* § 9–312, 3 U. L. A. 531 (1981), these characterizations do not affect the nature of the security interest. See § 9–107 (defining "purchase money security interest"), § 9–305 (providing for perfection of security interests by possession).

Section 101(28) of the 1978 Act defines a lien as a "charge against or interest in property to secure payment of a debt or performance of an obligation." It does not make distinctions based on the purchase-money or possessory nature of a lien.

[7] The Frazier-Lemke Act permitted the farmer, if the mortgagee assented, to purchase the property at its then-appraised value on a deferred payment plan. If the mortgagee refused to assent, the court was required to stay all proceedings for five years, during which time the farmer could retain possession by paying a reasonable rent. After five years the property could be reappraised, but the farmer still had the right to purchase it

void because it effected a "taking of substantive rights in specific property acquired by the Bank prior to" its enactment. 295 U. S., at 590. In his opinion for the Court, Justice Brandeis stated:

> "[T]he Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public." *Id.*, at 602.

In *Armstrong*, materialmen delivered materials to a prime contractor for use in constructing Navy personnel boats. Under state law, they obtained liens in the vessels.[8] The prime contractor defaulted on his obligations to the United States, and the Government took title to and possession of the uncompleted hulls and unused materials, thus making it impossible for the materialmen to enforce their liens. We held that this constituted a taking:

> "The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking' and is not a mere 'consequential incidence' of a valid regulatory measure." 364 U. S., at 48.

The Government seeks to distinguish *Armstrong* on the ground that it was a classical "taking" in the sense that the Government acquired for itself the property in question,

---

free and clear for the appraised value regardless of the amount of the lien. See *Radford*, 295 U. S., at 597–598. Given the interest rate of 1%, the present value of the deferred payments was much less than the value of the property. *Id.*, at 591–593.

[8] Under the Uniform Commercial Code definition, these statutory liens would be nonpossessory, nonpurchase-money liens in personal property. See n. 6, *supra*.

while in the instant case the Government has simply imposed a general economic regulation which in effect transfers the property interest from a private creditor to a private debtor. While the classical taking is of the sort that the Government describes, our cases show that takings analysis is not necessarily limited to outright acquisitions by the government for itself. See *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982); *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980); *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922).

The Government finally contends that because the resale value of household goods is generally low, and because creditors therefore view the principal value of their security as a lever to negotiate for reaffirmation of the debt rather than as a vehicle for foreclosure, the property interests involved here do not merit protection under the Takings Clause. While this contention cannot be dismissed out of hand, it seems to run counter to the State's characterization of the interest as property, see n. 6, *supra,* to our reliance in other "takings" cases on state-law characterizations, see, *e. g., Kaiser Aetna* v. *United States*, 444 U. S., at 179, and also to at least some of the implications of *Radford, supra,* and *Armstrong, supra.*

The foregoing discussion satisfies us that there is substantial doubt whether the retroactive destruction of the appellees' liens in this case comports with the Fifth Amendment. We now consider whether, as a matter of statutory construction, § 522(f)(2) must necessarily be applied in that manner. We consider the statutory question because of the "'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided.'" *Lorillard* v. *Pons,* 434 U. S. 575, 577 (1978), quoting *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932).

The Court of Appeals thought § 522(f)(2) must apply retroactively, that is, to liens which attached before the enactment date, because "there would be *no* bankruptcy law applicable to cases [involving such liens] if it did not." 642 F. 2d, at

1197.   The court apparently thought that if § 522(f)(2) does not apply to liens which came into existence before the enactment date, then no part of the 1978 Act could apply to cases involving such liens.   This is not necessarily the case.   The liens, of course, exist under state law independently of the 1978 Act.   Although the 1978 Act, in general, is effective for all cases commenced after its effective date, Congress might have intended that provisions that destroy previously vested property rights apply only to interests that came into effect after the enactment date.   If § 522(f)(2) is such a provision, the remainder of the 1978 Act would not affect the enforceability of these liens, but would still apply to these liens and these cases.   We think that the analysis of the Court of Appeals did not adequately dispose of the question as to the retrospective effect of § 522(f), and we therefore pursue the inquiry further.

The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student.   Compare 1 C. Sands, Sutherland on Statutory Construction § 1.06 (4th ed. 1972), with *Linkletter* v. *Walker*, 381 U. S. 618, 622–625 (1965).   This Court has often pointed out:

> "[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past. . . . The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'"   *Union Pacific R. Co.* v. *Laramie Stock Yards Co.*, 231 U. S. 190, 199 (1913) (citations omitted).

See, *e. g.*, *United States Fidelity & Guaranty Co.* v. *United States ex rel. Struthers Wells Co.*, 209 U. S. 306, 314 (1908) ("The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive

such a construction if it is susceptible of any other"); *United States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801).

This principle has been repeatedly applied to bankruptcy statutes affecting property rights. In *Holt* v. *Henley*, 232 U. S. 637 (1914), the Court had before it a new statute granting bankruptcy trustees the position of a lienholder with priority over sellers on conditional sales contracts. Act of June 25, 1910, ch. 412, § 8, 36 Stat. 840. This provision, like § 522(f)(2), could be read literally to divest property interests which had been created before it was enacted. The 1910 statute, like the 1978 Act, applied to all bankruptcy cases instituted after it became effective.[9] Nonetheless, the Court followed the lead of the lower courts in refusing to infer retroactivity absent an explicitly "expressed intent of Congress." *Arctic Ice Machine Co.* v. *Armstrong County Trust Co.*, 192 F. 114, 116 (CA3 1911). See also *In re Schneider*, 203 F. 589, 590 (ED Pa. 1913). In his opinion for the unanimous Court, Justice Holmes stated that "the reasonable and usual interpretation of [bankruptcy] statutes is to confine their effect, so far as may be, to property rights established after they were passed." 232 U. S., at 639. See *Auffm'ordt* v. *Rasin*, 102 U. S. 620, 622 (1881).

The Government nonetheless contends that bankruptcy statutes are usually construed to apply to pre-existing rights. This statement is unobjectionable in the context of traditional contract rights, *Hanover National Bank* v. *Moyses*, 186 U. S., at 188, but none of the cases cited by the Government extend it to property rights such as those involved here.[10]

---

[9] The transition provisions of the 1910 statute, § 14, 36 Stat. 842, are, in substance, the same as those of the 1978 Act. Pub. L. 95–598, Title IV, §§ 402, 403(a), 92 Stat. 2682, 2683.

[10] *Claridge Apartments Co.* v. *Commissioner*, 323 U. S. 141 (1944), involved rights to certain tax benefits, not to property rights. *Dickinson Industrial Site, Inc.* v. *Cowan*, 309 U. S. 382, 383 (1940), dealt with the application of new procedural rules to a bankruptcy proceeding that was pending when the new statute was enacted. Allowing an appeal to the Circuit Court of Appeals rather than the District Court in that case did not

Neither these cases, nor any other that has come to our attention, casts doubt on the principle of statutory construction deducible from *Holt* and *Auffm'ordt:* No bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress. In light of this principle, the legislative history of the 1978 Act suggests that Congress may not have intended that § 522(f) operate to destroy pre-enactment property rights.

An early version of the 1978 Act contained an explicit requirement that all its provisions "shall apply in all cases or proceedings instituted after its effective date, regardless of the date of occurrence of any of the operative facts determining legal rights, duties, or liabilities hereunder." § 10–103(a), H. R. 31, 94th Cong., 1st Sess. (1975), reprinted in Bankruptcy Act Revision: Hearings on H. R. 31 and H. R. 32 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st Sess., Appendix 320–321 (1975). This provision may or may not have been deleted directly in response to the comments of witness William Plumb to the effect that retroactive invalidation of liens may be an unconstitutional taking. *Id.,* at 2066–2067. Nonetheless, Congress' elimination of an explicit command is some evidence that it did not intend to depart from the usual principle of construction. See *Bradley*

---

eliminate any property rights. *Carpenter* v. *Wabash R. Co.,* 309 U. S. 23 (1940), involved a provision giving personal injury judgments the status of operating expenses and thus priority over mortgages in ongoing railroad reorganizations. Although that statute may have disadvantaged the mortgagees by reducing the amount of cash available to pay their notes, it did not affect their property right in the collateral securing the mortgages. *McFaddin* v. *Evans-Snider-Buel Co.,* 185 U. S. 505 (1902), considered a curative statute providing the methods by which valid mortgages could be created in the Indian Territory. The *Legal Tender Cases,* 12 Wall. 457, 549–550 (1871), decided only that debts could be paid in legal tender as defined by Congress at the time of payment without impairing the obligation of contracts.

v. *Richmond School Board*, 416 U. S. 696, 716, n. 23 (1974) ("we are reluctant to read into the statute the very . . . limitation that Congress eliminated").

"Accordingly, in the absence of a clear expression of Congress' intent to" apply § 522(f)(2) to property rights established before the enactment date,[11] "we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the" Takings Clause. *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 507 (1979).[12] The judgment of the Court of Appeals must therefore be

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in the judgment.

This case concerns the Bankruptcy Act of 1978, 11 U. S. C. § 101 *et seq.* (1976 ed., Supp. V), and, in particular, the exemption provisions of § 522 of that Act. Specifically at issue is the effect of certain of these exemption provisions upon nonpossessory, nonpurchase-money obligations given by debtors to small loan companies before the enactment of the

---

[11] Because all of the liens at issue in this case were established before the enactment date we have no occasion to consider whether § 522(f)(2) should be applied to liens established after Congress passed the Act, but before it became effective.

[12] "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' . . . Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion. . . . A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, 'excepting as a different purpose is plainly shown.'" *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543–544 (1940) (footnotes omitted).

Act. The purported liens apply generally, not specifically, to property of the kind described and, as a practicable matter, there is nothing to prevent the debtor's selling the property and replacing it or not replacing it, just as he chooses.

Section 522, for the first time, established a set of federal exemptions for individual debtors. Concededly, the section, as all similar statutes, was enacted to protect the debtor's essential needs and to enable him to have a fresh start economically. Section 522(f)(2) permits the debtor to "avoid the fixing" of a nonpossessory, nonpurchase-money security interest in certain property, but the subsection does not extend to all property otherwise exempt under § 522(d). It is limited to certain personal items, such as household furnishings, wearing apparel, jewelry, tools of the debtor's trade, and professionally prescribed health aids.

The Court naturally struggles with the question of the application of the new exemption provisions to obligations created before the new Act. It notes its concern with constitutional problems and it also greets with obvious relief the possibility of construing the Act as being only prospective in its operation. It then quickly pursues the latter route in order to avoid any constitutional issue.

I understand and can sympathize with the Court's desire thus to resolve the case. It is usually much easier to construe a statute so as to avoid a constitutional issue than it is to resolve the constitutional issue itself. And, of course, the Court's cases have announced that, where feasible, this is the preferred method. See, e. g., Lorillard v. Pons, 434 U. S. 575, 577 (1978).

Were we writing on a "clean slate," however, I would not pursue, in this case, that principle of construction-preference, for I think that the case would deserve consideration in greater depth. I see nothing in the statute with which we are concerned that speaks or hints of only prospective applicability, or that compels it, and I would find it necessary to reach the constitutional issue. I would then resolve that

issue in favor of the debtor and against the small-loan-company creditor. I would do so because the exemptions in question are limited as to kinds of property and as to values; because the amount loaned has little or no relationship to the value of the property; because these asserted lien interests come close to being contracts of adhesion; because repossessions by small loan companies in this kind of situation are rare; because the purpose of the statute is salutary and is to give the debtor a fresh start with a minimum for necessities; because there has been creditor abuse; because Congress merely has adjusted priorities, and has not taken for the Government's use or for public use; because the exemption provisions in question affect the remedy and not the debt; because the security interest seems to have little direct value and weight in its own right and appears useful mainly as a convenient tool with which to threaten the debtor to reaffirm the underlying obligation; because the statute is essentially economic regulation and insubstantial at that; and because there is an element of precedent favorable to the debtor to be found in such cases as *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), and *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980).

But we are not writing on a clean slate. It seems to me that the case of *Holt* v. *Henley*, 232 U. S. 637 (1914), is precisely in point and, unless the Court chooses to overrule it, must control the present case. There, Holt and the eventual bankrupt signed an agreement in 1909 for the installation of an automatic sprinkler system on the property of the eventual bankrupt. The agreement specified that the system was to remain Holt's property until paid for and that he was to have a right to enter and remove it upon failure to pay as agreed. Thereafter, but also in 1909, a mortgage deed was executed covering the plant and what was "acquired and placed upon the said premises during the continuance of this trust." *Id.*, at 639. Section 8 of the Act of June 25, 1910, ch. 412, 36 Stat. 840, amended § 47a(2) of the then Bank-

ruptcy Act to give the trustee in bankruptcy, as to property coming into the custody of the bankruptcy court, the rights of a creditor holding a lien. Upon Holt's debtor's bankruptcy, the mortgagees claimed the sprinkler system.

Justice Holmes, writing for a unanimous Court, observed that before the amendment "Holt had a better title than the trustees would have got" and that the Court was of the opinion "that the act should not be construed to impair it." 232 U. S., at 639. He went on:

> "We do not need to consider whether or how far in any event the constitutional power of Congress would have been limited. It is enough that the reasonable and usual interpretation of such statutes is to confine their effect, so far as may be, to property rights established after they were passed. . . . That is a familiar and natural mode of interpretation . . . . We are of opinion that [Holt's title] was not affected by the enactment of later date than the conditional sale. The opposite construction would not simply extend a remedy but would impute to the act of Congress an intent to take away rights lawfully retained, and unimpeachable at the moment when they took their start." *Id.*, at 639–640.

The Court then ruled against the claim of the mortgagees because they had made no advance on the faith of the sprinkler system and were not purchasers for value as against Holt, and because removal "would not affect the integrity of the structure on which the mortgagees advanced." *Id.*, at 641.

*Holt* v. *Henley* thus also involved a pre-existing agreement, a subsequent change in the then Bankruptcy Act, and the Court's preservation of the pre-existing right. I see no way to distinguish that case from this one, and I would affirm the judgment of the Court of Appeals simply on the compelling authority of *Holt* v. *Henley*. See also *Auffm'ordt* v. *Rasin*, 102 U. S. 620, 622 (1881). I would much prefer to avoid in this way the dicta the Court enunciates with respect to "takings."